James JOHNSON, Jr.,
Plaintiff–Appellant,

v.

D. MOREL, et al.,
Defendants–Appellees.

No. 86–3662.

United States Court of Appeals,
Fifth Circuit.

July 5, 1989.

Birch P. McDonough, New Orleans, La., for plaintiff-appellant.

Nat G. Kiefer, Jr., New Orleans, La., for defendants-appellees.

Before CLARK, Chief Judge, THORNBERRY, GEE, RUBIN, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, and DUHE, Circuit Judges.

PER CURIAM:

Guided by the Supreme Court's decision in *Graham v. Connor*, — U.S. —, 109 S.Ct. 1865, 104 L.Ed.2d 443 1989, we hold that the district court erred in granting summary judgment and that, on these facts, Johnson is entitled to go to trial on two federal constitutional claims, but not on a third such claim. Johnson's pendent state law claims must also be reinstated.

## I.

To decide his appeal, we must read the summary judgment evidence, including Johnson's affidavit, in the light most favorable to Johnson's claims. So read, his assertions reprise the "night rider" cases of an earlier day. Johnson was crossing the Mississippi River Bridge along with four passengers in an old car. Johnson and his passengers were all black men. The car stalled. Another driver began pushing Johnson's car up toward the bridge's crown. Officer Morel, a white man, waved off the good Samaritan. Morel began pushing the stalled car with his police car. His assistance was instantly coupled to racial epithets and harassment. Morel used his loudspeaker to call the black men "niggers," to insult their intelligence, and to shout vile racial slurs. The men in the old car shouted to Morel that they feared he was pushing them too fast because their old car's brakes were defective. They told him they were worried that they might crash as they gathered speed on the bridge's downward slope. Morel's reaction was to broadcast more racial slander. When they reached the foot of the bridge, Johnson got out of his car to submit to Morel. The officer continued his degrading verbal abuse and said he would make an example of Johnson. He searched Johnson roughly, cuffed his hands, placed him under arrest and ridiculed him. Morel applied the handcuffs so tightly that they not only broke the skin, but left apparently permanent scars on Johnson's wrists and disabled him from his employment for about two weeks. According to Johnson's story, Officer Morel used his badge to harass and humiliate him because he was black.

We do not pass upon the accuracy of Johnson's version of these events. For purpose of the appeal, we must assume it is true. In it are two distinct constitutional claims, both raised by Johnson's § 1983 complaint that Officer Morel deprived him of constitutional rights "guaranteed to him by the Fourth and Fourteenth Amendments." One claim is for a denial of equal protection. The second claim is based solely upon the allegedly excessive use of force

by a police officer in arresting him. *Graham* teaches each constitutional claim identified must be judged by reference to its own specific constitutional standard.

## II.

■ To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class. *Washington v. Davis*, 426 U.S. 229, 247–48, 96 S.Ct. 2040, 2051–52, 48 L.Ed.2d 597 (1976). Johnson's claim appears to do so. He alleges that Morel humiliated and harassed him, and that the insults and harassment were explicitly racist. If Johnson is able to show a constitutional violation, he is then entitled to damages for his injury, including any proved emotional distress resulting from the violation. *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed. 2d 252 (1978).

Because the district court did not comment directly upon Johnson's equal protection claims, we need not examine those claims further. We do not—indeed, we cannot—pass on the truth of those claims. Nor do we express any opinion upon the merits of Johnson's claims. The elimination of racial discrimination remains at the heart of the Fourteenth Amendment. The Constitution does not tolerate intentional police harassment of racial minorities. The facts adduced entitle Johnson to an opportunity to prove that his right to equal protection was abridged.

## III.

Johnson also alleges that Officer Morel denied his liberty interest in being free of an excessive use of force contrary to the Fourth Amendment. Apart from equal protection considerations, the evidence does not suggest and Johnson does not claim that the arrest was illegal; nor does he assert he was entitled not to be handcuffed. The measure which *Graham* sets for gauging this claim is as follows:

[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims. [footnote omitted]

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

[T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. [citations omitted].

Graham sustained a broken foot and claimed permanent physical impairment as a result of mistreatment in the course of his arrest. Johnson's injuries are of a different order. A fact issue remains to be resolved as to whether Johnson's injuries were constitutionally significant.

■ To determine whether a constitutionally actionable "significant injury" has been inflicted, the court must consider only the injuries resulting directly from the constitutional wrong. There can be a constitutional violation only if significant injuries

resulted from the officer's use of *excessive* force. Injuries which result from, for example, an officer's justified use of force to overcome resistance to arrest do not implicate constitutionally protected interests. An arrest is inevitably an unpleasant experience. An officer's use of excessive force does not give constitutional import to injuries that would have occurred absent the excessiveness of the force, or to minor harms. Nor can transient distress constitute a significant injury.

■ A plaintiff can thus prevail on a Constitutional excessive force claim only by proving each of these three elements:

(1) a significant injury,[1] which

(2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was

(3) objectively unreasonable.

If any one of these elements fails, so too does the plaintiff's claim. We overrule all previous decisions of this circuit to the contrary.

In this case, Johnson may show an unconstitutional use of excessive force, as distinguished from an equal protection violation, by presenting evidence that his injuries were significant, and that Morel used unreasonable, excessive force to inflict those injuries. The evidence in Johnson's affidavit creates fact issues on both points.

To the extent that Johnson asserts a claim based on substantive due process it cannot be sustained under *Graham.*

For the reasons stated, Johnson must be permitted to go forward with his claims for equal protection and unreasonable seizure. The district court should also reinstate Johnson's pendent state law claims for recovery against Morel's statutory bond and for negligent or wrongful acts. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The summary judgment granted by

the district court is reversed and the case is remanded.

REVERSED AND REMANDED.

ALVIN B. RUBIN, Circuit Judge, with whom THORNBERRY, REAVLEY, POLITZ, KING, JOHNSON and WILLIAMS, Circuit Judges, join concurring in part and concurring in the judgment:

Equity delights to do justice, an ancient axiom goes, and not by halves. Federal courts should be equally diligent to vindicate constitutional rights fully, not by quotient.

I join in the court's judgment insofar as it reverses the judgment summarily entered and remands the case for further proceedings. Johnson's claims that he was denied equal protection of the law by Morel's actions during—as well as, I take it, before and after—his arrest, and that Morel violated his Fourth Amendment rights by using excessive force in the course of the investigatory stop and arrest both merit reinstatement. I respectfully dissent, however, from the majority's imposition of novel requirements for invocation of the Fourth Amendment that it adds to those stated only days ago by the Supreme Court in *Graham v. Connor.*[1]

The majority holds that a police officer does not violate the Fourth Amendment in making an investigatory stop or arrest even when he uses force that is excessive and unreasonable by an objective standard unless that force is "clearly excessive to the need," and inflicts a "significant" injury that flows "directly and only" from the use of excessive force. I do not share the majority's desire to confine the rights so recently and plainly stated by the Supreme Court, especially since these added restrictions on the scope of the Fourth Amendment are imposed by *ipse dixit* without so much as a citation of authority or a statement of reasons for imposing them.

---

1. We think it unlikely that such a significant injury will be caused by unnecessary force without significant *physical* injury. However, on the facts before us here, we do not decide whether a significant but non-physical injury would be legally sufficient.

1. —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Moreover, because the judgment accords Johnson the right to prove only a part of the claims he asserts, I respectfully dissent from the court's failure to reverse the summary judgment insofar as it rejects Johnson's claims for denial of due process of law in the events preceding and subsequent to his arrest.

## I.

Recovery under the Fourth Amendment requires no showing of significant injury.[2] Indeed, just as nominal damages may be awarded for a procedural due process violation that does not cause actual damage,[3] they may be awarded for a Fourth Amendment violation.[4] In *Lester v. City of Chicago*,[5] an opinion that anticipated *Graham*, the Seventh Circuit explained:

> The Fourth Amendment protects against unreasonable seizures, not seizures that "shock the conscience" or cause "severe injuries." If, under the totality of circumstances, a police officer unreasonably seizes a person by using excessive force, he has violated that person's Fourth Amendment rights. The objectively unreasonable seizure itself ... crosses the constitutional threshold.[6]

Even under the stringent Fourteenth Amendment "shock the conscience" test, a plaintiff could recover for a policeman's use of excessive force without demonstrating that he had suffered severe,[7] permanent,[8] or physical injuries.[9] The Fourth Amendment too protects against unreasonable conduct during searches and seizures, whether or not a significant injury is inflicted. That protection is not limited to physical injuries but extends to all damage inflicted whatever may be said to the contrary in the majority's gratuitous and unsupported dicta.

The *Graham* Court was at least given the opportunity to consider whether it should impose a "severe" injury requirement. In the amicus brief filed by the United States in *Graham*, the Solicitor General argued that the Court should adopt the reasonableness standard, but that:

> [A] "severe injury" requirement is ... inappropriate. Under that standard, a police officer could, without any justification, beat a person on the head with a club if the beating causes only a bruise. Similarly, a police officer could terrorize a nondangerous suspect by pointing a gun at his head if the chambers of the gun are empty. In short, acceptance of the standard would allow the unreasonable use of force in cases where police conduct poses a grave risk and causes terror or even physical harm, but where the person seized, by chance, does not suffer a "severe injury."[10]

Although the Court did not rule on the question explicitly, its opinion surely contains no quantum-of-injury criterion.

The majority does not content itself with adding a significant-injury requirement to the Fourth Amendment. It also confects, without citing any support whatever and without giving any explanation, a new causation requirement. The injured plaintiff must show that his injury resulted "directly and only" from the use of excessive force, a requirement for recovery for a constitutional violation that, so far as the opinion cites, is nowhere else required. In contrast, a plaintiff in an equal protection suit may be required to show only that race

---

**2.** *Lester v. City of Chicago*, 830 F.2d 706, 712 (7th Cir.1987). *See also Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462 (9th Cir.1984).

**3.** *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978).

**4.** *See, e.g., Bilbrey*, 738 F.2d at 1471–72; *Hunter v. Auger*, 672 F.2d 668, 677 (8th Cir.1982).

**5.** 830 F.2d at 706.

**6.** *Lester*, 830 F.2d at 712 (emphasis added).

**7.** *Norris v. District of Columbia*, 737 F.2d 1148, 1151 (D.C.Cir.1984); *Lewis v. Downs*, 774 F.2d 711, 714 (6th Cir.1985).

**8.** *Lewis*, 774 F.2d at 714.

**9.** *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986).

**10.** Brief of the United States as Amicus Curiae in *Graham v. Connor*, —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

was "a motivating factor" in allegedly discriminatory conduct in order to recover,[11] and a First Amendment plaintiff need show only that an exercise of First Amendment rights was a "substantial factor" in the decision to dismiss him to shift the burden of proof to his employer.[12] Even if these cases are distinguishable, a § 1983 plaintiff ordinarily need prove only cause in fact and proximate or legal cause, not *sole* causation.[13]

Moreover, not content with the Supreme Court's formulation of the standard for excessive force, the majority requires a plaintiff to prove that the force was not only excessive, but "clearly excessive." I do not think the members of the Supreme Court wrote so inartfully as to require us thus to improve on their opinion.

## II.

I turn now to majority's refusal to reverse the summary judgment insofar as it dismisses Johnson's due process claim. Johnson contends not only that excessive force was used against him in the investigation and arrest phases of his encounter with Morel, but also that Morel abused him both before beginning the investigation and after completing his arrest, thereby invading his due process rights in addition to denying him equal protection of the laws.

To assess the due process claim, it is necessary to consider the factual context out of which Johnson's arrest arose. As the majority opinion recounts, Johnson is a black thirty-nine year-old self-employed carpenter who was living in New Orleans, Louisiana, and who had a contract to remodel a house in Marrero, which is located across the Mississippi River from New Orleans. On September 12, 1983, accompanied by the four members of his work crew, one of whom was his brother, he was driving his 1973 Oldsmobile across the Mississippi River Bridge en route to the job.

When he reached the plateau that forms the "crown" of the bridge, his engine and power brakes failed, and his car came to a dead stop. Fortunately, someone in a pickup truck saw his predicament and began to push his vehicle.

The bridge is patrolled by officers of the Mississippi River Bridge Authority, a Louisiana state agency. Moments after Johnson's mishap, Mississippi River Bridge patrolman David Morel arrived on the scene, driving an official vehicle. Morel, who had been driving toward New Orleans from the west in the opposite direction from Johnson, made a U-turn to reach him. Using the public address system in his car, he instructed the driver of the pickup truck, "Get from behind them. I got them." He then began to push Johnson's Oldsmobile with his police car. Soon he was going quite fast. When Johnson's car had passed the point at which the bridge begins to descend, Johnson stuck his hand out of the window to indicate to Morel that he should stop pushing. Johnson's brother also "hung his head out the window" and shouted, "the car won't crank, we got no brakes!" At that point Morel became abusive, and again broadcasting over his public address system, said, "You [so and so] niggers. Don't you know how to drive a [so and so] car?" This constituted unprovoked harassment as well as racial abuse.

No further embellishment of the succinct narrative in the majority opinion is required to demonstrate that Morel had neither probable cause nor reasonable suspicion that would justify his stopping and interrogating Johnson or requiring him to produce a driver's license.[14] Even in his brief, Morel does not assert that Johnson was driving recklessly or gave the police any other cause to suspect him of unlawful conduct. When Johnson reached the foot of the bridge, however, Morel signalled to

---

**11.** *Village of Arlington Heights v. Metro. Housing Dev.,* 429 U.S. 252, 270–71, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977).

**12.** *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

**13.** *See* 2 D. Rotunda, J. Nowak, & J. Young, Treatise on Constitutional Law § 19.33 at 807 (1986).

**14.** *Cf. Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979).

him to pull over. This is the earliest moment at which the investigation and arrest stage of the encounter could have begun.

Morel asked him to produce his driver's license. When Johnson produced the license, which had been suspended, Morel said, "I'm going to make an example out of you." The passengers in Johnson's car heard this exchange. At some point, they began to get out of the car, presumably to intercede, but Morel told them to get back in the vehicle. They did so after Johnson told them to "[d]o like the man told you." Officer Morel also asked for Johnson's auto registration certificate. Although Johnson in fact had a registration certificate in the car, neither he nor his brother was able to find it at that moment, and Morel would not allow Johnson additional time to look for it. Instead, Morel ordered Johnson to "spread eagle" against the car, searched him roughly, and told him he was under arrest.

The majority opinion correctly states that Johnson does not claim that his arrest was illegal, and adds in an aside that "the evidence does not suggest" that it was illegal. That is correct only if Morel had some reasonable basis to justify his stopping Johnson and demanding his license, which, as just noted, does not appear to be the case.

Although Johnson had offered no resistance, had advised his passengers not to intervene when they seemed likely to intercede with Morel, and had given Morel no occasion to use any force whatever, Morel handcuffed his hands so tightly behind his back that the circulation to them was cut off. Johnson thereafter repeatedly asked Morel to loosen the cuffs, but Morel's reply was that he intended to make an example of Johnson. In addition, Johnson testified that throughout the ride to Central Lockup Morel abused him verbally and physically, and continually reminded Johnson of his intention to make an example of him.

Eventually, Morel brought Johnson to the Central Lockup. When they arrived, Johnson waited about five or ten minutes, then asked one of the jailers, "Man, can you do something about these cuffs? They're killing me." The jailer obtained some keys and removed the handcuffs.

Morel booked Johnson for driving after his license had been suspended and for failing to possess a car registration. It is not clear when the charges were actually filed, but at some time after Johnson was arrested, he became a pretrial detainee.[15] He was thereafter protected by the Due Process Clause, not the Fourth Amendment.[16].

Morel also attempted to find some additional charges that he could lodge against Johnson. After he had searched police records, he filed a charge at 11:00 p.m., some twelve hours after the initial incident, based on an old complaint for issuing a $13 worthless check. It turned out that Johnson had paid the check and this charge was later withdrawn.

Thus, before Morel's investigation even began, without so much as a reasonable suspicion that Johnson had violated any law, Morel insulted and verbally abused him. He did so gratuitously, out of personal pique, and without any discernible law-enforcement motive. The majority implicitly recognizes this by reversing the summary judgment insofar as this conduct may have been racially discriminatory, but it fails to recognize that this same conduct gives rise at least to an arguable claim for police harassment of an innocent citizen in addition to the one for denial of equal protection.

To the extent that Morel's verbal abuse may have been intentionally racially discriminatory and to the extent he treated Johnson differently from the way he would have treated a white person, Johnson has an equal protection claim. To establish this claim, he must, as the majority notes, prove intentional discrimination because of his race.[17] If, however, the evidence at

---

**15.** *Bell v. Wolfish,* 441 U.S. 520, 523, 99 S.Ct. 1861, 1865, 60 L.Ed.2d 447 (1979).

**16.** *See id. But cf. Graham,* —— U.S. at —— n. 10, 109 S.Ct. at 1871 n. 10.

**17.** Majority opinion, at 478. *See Washington v.*

trial establishes that Morel was in the habit of addressing all who offended him vituperatively, and of acting with equal arrogance toward all, black and white, Johnson may be unable to show that he was a victim of discrimination rather than of official and officious effrontery that was directed equally against all who fell in Morel's path. It does not follow, however, that such a consistent abuse of power violates no constitutional right or that Johnson should be forced to elect to assert one constitutional right rather than another at this pretrial stage.

I see no reason, therefore, to foreclose Johnson's claim for denial of due process. Certainly the opinion in *Graham v. Connor* does not do so. That opinion is confined to the:

> constitutional standard [that] governs a free citizen's claim that law enforcement officials used excessive force *in the course of making an arrest, investigatory stop, or other "seizure" of his person.*[18]

The *Graham* opinion later states explicitly that it deals only with the Fourth Amendment and that Fourth Amendment protection against excessive force begins only when a person is detained, stating:

> A "seizure" triggering the Fourth Amendment's protections occurs *only when government actors have, "by means of physical force or show of authority, ... in some way restrained the liberty of a citizen."*[19]

*Graham* therefore, does not address alleged constitutional violations that occur before a victim has been seized, let alone before the intention to seize him has even been formed.

The Court in *Graham* also did not consider claims for official mistreatment that arise after arrest, when the seizure of the person has been completed. The Court stated:

> Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. *It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.*[20]

We do not yet know whether Johnson's due process claims have merit. At this stage they ought not be summarily rejected because they have at least an arguable basis in fact and law. That the majority chooses to dismiss them cursorily is even more surprising when we read the district court's summary judgment opinion and the panel opinion that was the basis for the rehearing en banc, for both of them addressed only the viability of Johnson's claims under the Due Process Clause, an issue the majority decides without discussion.

### III.

Save for the relatively few cases, 150 or so each year, in which the Supreme Court can act, the courts of appeals are the federal courts of last resort for the protection of constitutional rights. When we vindicate those rights, we truly uphold and defend the Constitution, giving it the role envisioned by the Founding Fathers: confining the government to limited powers and protecting the citizenry against abuse from that government and its officials. Al-

---

*Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976); *Wright v. Georgia,* 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963); *Kenyatta v. Moore,* 744 F.2d 1179, 1185 n. 27 (5th Cir.1984), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2141, 85 L.Ed.2d 498 (1985); *Marvin H. v. Austin Indep. School Dist.,* 714 F.2d 1348, 1357 (5th Cir.1983).

**18.** *Graham,* —— U.S. at ——, 109 S.Ct. at 1867 (emphasis added).

**19.** *Graham,* —— U.S. at ——, n. 10, 109 S.Ct. at 1871, n. 10 (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)) (emphasis added).

**20.** *Graham,* —— U.S. at —— n. 10, 109 S.Ct. at 1871 n. 10 (citing *Bell v. Wolfish,* 441 U.S. 520, 535–39, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979)) (emphasis added). *See also United States v. Stokes,* 506 F.2d 771, 776 (5th Cir. 1975).

though for three-fourths of a century the Constitution together with the Bill of Rights thus confined only the federal government, its shield was extended by the Fourteenth Amendment to protect all persons against abuse of power by state governments and their officials. The majority opinion renders significant support to the protection of the innocent citizen against abuse by petty and insolent government officials. I regret that the majority sees fit to cabin that protection by adding new restrictions to the safeguards accorded by the Fourth Amendment without any support from precedent, and by summarily rejecting the additional due process claims.